OPINION
Appellant, George Foster, appeals from the judgment of the Trumbull County Court of Common Pleas convicting him of the kidnapping, rape, and aggravated murder of Bridget Wetzel.
On May 24, 1999, appellant was indicted on aggravated murder, in violation of R.C. 2903.01(C), aggravated murder, in violation of R.C.2903.01(B); rape, in violation of R.C. 2907.02(A)(a)(b); and, kidnapping, in violation of R.C. 2905.01(A)(4). On August 31, 1999, the Trumbull County Grand Jury returned a superceding indictment indicting appellant on aggravated murder, in violation of R.C. 2903.01(C); aggravated murder with specification of aggravated circumstances, in violation of R.C. 2903.01(B); kidnapping, in violation of R.C.2905.01(A)(4); and, three counts of rape, in violation of R.C.2929.04(A)(7). The trial court dismissed the original indictment and proceeded on the superceding indictment.
On May 14, 1999, at approximately 11:40 p.m., Teresa Wetzel notified the Weathersfield police that Bridget, her ten-year old daughter, was missing and had last been seen with appellant. Weathersfield Patrolman Daniel Adkins took the initial missing person's report and attempted to contact appellant at his home, at the request of Weathersfield Police Caption Joseph Consiglio, ("Consiglio"). Appellant was not home. However, at approximately 1:00 a.m., Joan Peterson ("Peterson"), appellant's fiancée, advised the Weathersfield Police Department that appellant had returned and was willing to speak to them at the police station. Peterson and appellant, who did not drive, were transported to the police station in a cruiser.
At the police station, Consiglio informed appellant that he was conducting an investigation into Bridget's disappearance. Consiglio noticed that appellant had fresh scratches on his face and arms. When asked, appellant explained that he had gotten scratched while searching for Bridget in the woods. Appellant was very cooperative and even led a search into the area of the woods, known as "the Flats", where he and Bridget had gone earlier to look for baby raccoons. The search, which lasted from approximately 3:00 a.m. to 4:21 a.m., did not produce any sign of the missing child. Appellant was not placed under arrest. Instead, appellant was taken home and asked to remain there, in case the police had additional questions.
Notwithstanding the request that appellant remain home, appellant and Peterson were observed walking near a baseball field, less than two hours later. McDonald Police Officer William Woodley III ("Woodley") spoke with appellant and walked with him along Banish Trail. While walking, they spotted a bicycle at the bottom of a steep embankment. Appellant walked down the embankment, inspected the bicycle, and determined it was not Bridget's.
The McDonald Police Department notified the Weathersfield Township Police Department of appellant's whereabouts. Weathersfield Police Officer Stitt transported appellant and Peterson home in his cruiser. At approximately 9:30 a.m., appellant consented to a search of his residence. The search did not reveal any sign of Bridget.
At approximately 11:00 a.m., Bridget's bicycle was discovered next to an abandoned cement factory, in Weathersfield Township. At approximately 2:30 p.m., Bridget's body was found in a thickly wooded area, in McDonald Village. She was nude, except for her left sneaker, her knees were bent upwards, and her legs were spread. Bridget's clothing was found near her body.
McDonald Village Police Chief Leskovac immediately ordered that appellant be brought in for questioning. McDonald Officer Robert Santee ("Santee") and Woodley went to appellant's residence and informed him that he was needed for additional questioning. The officers told both appellant and his father that appellant was not under arrest. Appellant agreed to go to the station, consented to being patted down prior to entering the cruiser, and was very cooperative.
Appellant, Santee, and Woodley arrived at the McDonald Police Department at approximately 3:30 p.m. The officers were thirsty and decided that Santee would leave to purchase some beverages. Officers Woodley and Santee knew of appellant's prior violent behavior toward the police, including an incident where he fought with an ambulance driver and police officers and another incident where the McDonald Police Department was called to assist Weathersfield police officers attempting to detain appellant. Therefore, Santee asked if appellant could be placed in a wrist restraint, for Officer Woodley's safety, while Santee briefly went to the store. Appellant consented to the wrist restraint and extended his left arm. The wrist restraint was not used to prevent appellant from leaving, but as condition of his staying, while only one officer was present. Officer Santee returned five or ten minutes later, the wrist restraint was immediately removed, and appellant was again advised that he was not under arrest.
Shortly thereafter, Lieutenant Deluga arrived and instructed Woodley to read appellant his Miranda rights. Woodley advised appellant that he was not under arrest, read him his Miranda rights, gave him a written copy of his rights, and appellant signed a written waiver of those rights. Appellant did not assert his right to remain silent, did not ask to consult an attorney, and did not ask if he could leave. Appellant agreed to be fingerprinted, but was not booked, photographed, or locked in a cell. After he was fingerprinted, appellant was permitted to wash his hands, unsupervised, in a public restroom. Appellant then told Santee that he was tired. He was permitted to lie down in an unlocked cell until the Trumbull County Sheriff's Department was ready to talk to him. Per procedure, appellant's belongings were taken, inventoried, and placed in a bag. However, appellant was told that he was not under arrest and was free to go at any time. In fact, appellant left the cell, unsupervised, to get a drink of water.
Detective Sergeant Peter Pizzulo ("Pizzulo"), an evidence technician for the Trumbull County Sheriff's office, assisted Dr. Germaniuk with the crime scene investigation. As part of the sexual assault kit, Dr. Germaniuk swabbed the victim's mouth, rectum, and vagina. The swabs, as well as the victim's clothing, were sent to the Bureau of Criminal Identification ("BCI"). After completing his work at the crime scene, Pizzulo went to the McDonald police station.
Appellant agreed to speak with Pizzulo. Prior to interviewing appellant, Pizzulo told him that he was not under arrest and administered the Miranda warnings orally and in writing. Appellant signed a second waiver of those rights. While reciting the Miranda rights, Pizzulo erroneously advised appellant: "If you cannot afford a lawyer, if you are charged with a crime, one will be appointed to you by the court." However, the written waiver executed by appellant, does not contain any misstatements.
The interview, which began at approximately 7:00 p.m., was initially audiotaped. A number of breaks were taken throughout the interview. During some of these breaks, Major James Phillips ("Phillips") provided Pizzulo with new information received from field officers and witnesses, including Mary Skufca ("Skufca"), George Corado ("Corado"), John Budreveich ("Budreveich"), and Rick Savin ("Savin"). On the day of the murder, appellant, a white male, approximately five feet five inches tall, with long hair, was wearing black jeans, a black shirt, and a black leather jacket.
Skufca, a cook at Roosevelt Elementary School, knew Bridget Wetzel from school. She told the police that she saw Bridget, between 5:00 p.m. and 7:00 p.m., on May 14, 1999, walking with a man who was approximately five feet three inches tall, had dark, shoulder length hair, and was dressed all in black. Bridget was walking with this man up a path leading into the woods.
Corado, a retired sales manager from Tri-State Distributing, reported that he saw a man dressed all in black, with hair so long hair that he had at first mistaken him for a woman, walking with a young girl, approximately ten years of age. Corado stated that he saw the man and the girl near the cement plant; the exact location where the body was found.
Budrevich reported that he saw two individuals matching appellant's and Bridget's descriptions, at approximately 5:30 p.m., on May 14, 1999. Savin, a friend of appellant, told police that the day before Bridget disappeared, appellant told him that "[h]e was looking for young good pussy."
At 11:40 p.m., appellant gave a videotaped statement lasting approximately one hour. Prior to beginning the videotaped statement, Pizzulo again reminded appellant of his Miranda rights, verified appellant's signature on the rights waiver form, and told appellant that he was not under arrest. After a few minutes, the battery failed and Pizzulo decided to start over, from the beginning. As a result, appellant was again reminded that he had been made aware of his Miranda rights and that he had waived those rights. During this interview, Foster's story changed and he did not deny with certainty that he had killed Bridget.
After appellant completed his videotaped statement, a decision was made to place him under arrest. At approximately 12:40 a.m., Pizzulo informed appellant that he was under arrest. Peter Lucic, a lieutenant with the Trumbull County Sheriff's Department, transported appellant from the McDonald Police Department to the Trumbull County jail. Appellant initiated a conversation asking Lucic, "What's going to happen to me now?" Lucic immediately inquired whether appellant had been apprised of his rights. Even though appellant responded affirmatively, Lucic repeated the Miranda rights. Subsequently, appellant confessed to killing Bridget, but denied any sexual contact.
Because of appellant's confession, Lucic transported him to the Panther Street offices instead of jail. Appellant was willing to give another statement, but preferred not to talk to Pizzulo. Phillips read appellant's constitutional rights and appellant signed his third waiver thereof. Phillips began a videotaped interview, at 2:25 a.m., on May 16, 1999, during which appellant denied removing Bridget's clothing and agreed to submit to a polygraph examination in that issue.
James Teeple, an investigator for the Trumbull County prosecutor's office, was called to conduct the polygraph examination. At approximately 2:30 p.m., Teeple began the pre-polygraph interview and read appellant the Miranda rights. Appellant signed his fourth waiver of those rights. During the pre-polygraph interview, appellant made several new admissions regarding the circumstances surrounding Bridget's death. Appellant admitted that he had engaged in some sexual conduct with Bridget, removed her clothing, and propped her body in a position to give the appearance that she had been raped. As a result of these admissions, Teeple decided not to conduct the polygraph examination. Instead, Teeple decided to conduct a videotaped interview and again advised appellant of theMiranda rights.
Prior to trial, appellant filed a number of motions, including a motion styled "Defendant's Motion to Suppress Fruits of an Unconstitutional Arrest" and "Defendant's Motion to Suppress Statements. On August 12th, 13th, 16th, and 17th, 1999, a hearing was held on appellant's motions to suppress various statements made to the police. During this hearing, Corado made an in-court identification of appellant, based on his observation of appellant on May 14, 1999. On January 14, 2000, the trial court entered findings of fact and conclusions of law wherein it denied appellant's motions to suppress.
On December 13, 1999, appellant filed a motion to suppress the identification testimony offered by George Corado at the suppression hearing. On January 14, 1999, the trial court entered findings of fact and conclusions of law wherein it denied appellant's motion to suppress Corado's in court identification.
A jury trial began on January 18, 2000. At trial, the prosecution again presented the testimony of Adkins, Garlow, Stitt, Consiglio, Woodley, Pizzulo, Lucic, and Philips, as well as other witnesses. On February 10, 2000, the jury found appellant guilty of all counts and specifications. The mitigation phase began on February 14, 2000. On February 17, 2000, the jury recommended a sentence of life in prison, with no possibility of parole, and the trial court sentenced appellant in accordance with the jury's recommendation.
From this judgment, appellant assigns the following as error:
 "[1.] The trial court erred by denying the appellant's motion to suppress statements made by appellant to police officers.
 "[2.] The appellant's conviction is against the manifest weight of the evidence.
 "[3.] The appellant was denied his constitutional right to a fair trial due to numerous instances of prosecutorial misconduct which substantially prejudiced him and misled the jury."
 In his first assignment of error, appellant posits that the trial court erred by denying his motions to suppress. Appellant argues that the police did not have the constitutionally requisite suspicion or probable cause to justify confronting, detaining, and arresting him. As a result, appellant contends, his confessions should have been suppressed as fruits of an illegal arrest and that the statements were obtained in violation of his rights as outlined in Miranda v. Arizona (1966), 384 U.S. 436. Appellant also asserts that the trial court erred in failing to suppress Corado's in-court identification.At a suppression hearing, the trial court, acting in its role as trier of facts, is in
the best position to resolve questions of fact and to evaluate the credibility of witnesses. See e.g., State v. Mills (1992),62 Ohio St.3d 357, 366. A trial court's decision regarding a motion to suppress will not be reversed if it is supported by competent, credible evidence. State v. Guysinger (1993), 86 Ohio App.3d 592, 594. When reviewing a trial court's ruling on a motion to suppress, an appellate court must accept the trial court's findings of fact if they are supported by competent credible evidence. Id. An appellate court must independently determine, without deferring to the trial court's conclusions, whether the facts meet the applicable standard, as a matter of law. State v. Klien (1991), 73 Ohio App.3d 486, 488.
At the outset, we must determine whether there was an illegal arrest. "The magic words `you are under arrest' are not necessary to constitute an arrest." State v. Maurer (1984), 15 Ohio St.3d 239, 255. If a person "is deprived of his movement by the state he is in custody and considered under arrest, if he could not have attempted to leave." Id. at 255-256, citing Dunaway v. New York (1979), 442 U.S. 200; Florida v. Royer
(1983), 460 U.S. 491; Brown v. Illinois (1975), 422 U.S. 590. "The determination of whether one is in custody focuses on how a reasonable person in the detainee's position would have felt in the same position."State v. Gaston (1996), 110 Ohio App.3d 835, 842, citing Berkemer v.McCarty (1984), 468 U.S. 420, 434.
In this case, on May 15, 1999, appellant was advised that he was needed for questioning, told that he was not under arrest, was not handcuffed, and voluntarily went to the police station for questioning. Arguably, once appellant was voluntarily placed in a wrist restraint, for officer safety, he was detained and in custody. "A suspect cannot be detained without reasonably objective grounds." Maurer at 256, citing UnitedStates v. Mendenhall (1980), 446 U.S. 544, 555. While we do not conclude that appellant was, in fact, detained prior to formally being placed under arrest, the record demonstrates that the police had reasonably objective grounds sufficient to detain appellant. Thus, any detention could not constitute an illegal arrest.
In this case, when appellant was placed in the wrist restraint, the police knew that appellant, a close friend of the victim's family: was the last person seen with the victim; had fresh scratches on his face and arms; and, admitted to taking the victim into the woods, in the vicinity of the location where her body was found. The police are deemed to have probable cause when "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio (1964), 379 U.S. 89, 91. Therefore, we conclude that the McDonald Village police[1] had reasonably trustworthy information sufficient to warrant a prudent man in believing that the petitioner had caused the death of Bridget Wetzel. Because the police had reasonably objective grounds sufficient to warrant detaining appellant, appellant's contention that there was an unconstitutional arrest is untenable.
Further, even if such detention did constitute an illegal arrest, appellant's subsequent confessions were so attenuated that any taint from the arrest had been purged. Recognizing that "persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality," the United States Supreme Court articulated a multi-factored test, for deciding when a confession is sufficiently attenuated and, thus, admissible. Brown v. Illinois 422 U.S. 590,603. The court must: (1) determine that the statements were voluntary; (2) consider the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and, (4) the flagrancy of the official misconduct. Id. at 603-604. Thus, Miranda warnings, although relevant to the determination of whether a confession was obtained by exploitation of an illegal arrest, are not dispositive.
Applying the attenuation test set forth in Brown, we conclude that appellant was read his Miranda warnings prior to any custodial interrogation and that his subsequent confessions were voluntary. Additionally, more than nine hours had elapsed between the time appellant was temporarily placed in a wrist restraint and the time he confessed to Lucic that he had killed Bridget. In that time, the record reveals the following intervening circumstances: appellant was taken into another room; told he was not under arrest; was Mirandized and signed a written waiver; chose to sleep in an unlocked cell and left the cell unsupervised; was re-Mirandized, orally and in writing, by a new department, the Trumbull County Sheriff's Office; signed a second written waiver; and, was reminded that he was not under arrest and told that he could leave at any time.
Further, any misconduct on the part of the police was not flagrant. Appellant was placed in a wrist restraint for officer safety and the record is devoid of any indication that appellant was threatened or coerced into confessing. Therefore, assuming, arguendo, that there had been an illegal arrest, appellant's statements would still be admissible pursuant to the doctrine of attenuation. See Brown, supra.
In Miranda v. Arizona, 384 U.S. 436, 478, the United States Supreme Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." The protections of Miranda attach only where an individual is subject to custodial interrogation. State v. Roe (1989),41 Ohio St.3d 18, 22. It is undisputed that appellant had been properlyMirandized and had signed a written waiver of his rights prior to the improper Miranda. Hence, the issue is whether appellant's confessions and waivers were made knowingly, voluntarily, and intelligently, in light of the improper Miranda warning. "While voluntary waiver and voluntary confessions are separate issues, the same test is used to determine both, i.e. whether the action was voluntary under the totality of the circumstances." State v. Clark (1988), 38 Ohio St.3d 252, 261, see also,State v. Treesh (Dec. 18, 1998), Lake App. No. 95-L-057, unreported, 1998 Ohio App. LEXIS 4886, at * 28.
"An express written or oral statement of waiver of the right to remain silent * * * is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda
case." North Carolina v. Butler (1979), 441 U.S. 369, 373. "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." Id. Accordingly, the state bears the burden of proving by a preponderance of the evidence that prior to making a statement, the defendant had "voluntarily, knowingly, and intelligently" waived his Miranda rights.State v. Eley (1996), 77 Ohio St.3d 174, 178.
"In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus. In this case, at the time of the suppression hearing, appellant: was thirty-three years old; had obtained an 11th grade education; could read and write; and, had prior encounters with police. The Pizzulo interview was several hours long, but a number of breaks were taken. The record is silent as to the existence of physical deprivation, mistreatment, threat or inducement. In fact, the record reveals that appellant slept for several hours in an unlocked cell. We note that appellant asserts he is a paranoid schizophrenic, however, the record is devoid of any evidence that he, in fact, was diagnosed as such. Thus, we conclude that appellant's statements and waivers were voluntary under the totality of the circumstances.
Despite the foregoing, appellant contends that his confession and waivers were not voluntary because appellant was confused by Pizzulo's erroneous statement wherein he stated: "if you cannot afford a lawyer, if you are charged with a crime, one will be appointed to you by the court." Thus, we must determine what, if any, effect resulted from Pizzulo's single misstatement.
A reviewing court "need not examine Miranda warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably `convey to [a suspect] his rights as required byMiranda." Duckworth v. Eagan (1989), 492 U.S. 195, 203, citing Californiav. Prysock (1981), 453 U.S. 355, 361. There is nothing in the record to suggest that Pizzulo's statements confused or otherwise misled appellant. See, State v. Ringstaff (June 7, 1989), Medina App. No. 1758, unreported, 1989 Ohio App. LEXIS 2023. Prior to the improper Miranda
warning, appellant had been read the Miranda rights and signed a written waiver of those rights. Further, contemporaneously with the improperMiranda warning, appellant was given a proper written Miranda warning. Also, after the improper Miranda and audiotaped interview, Pizzulo conducted a videotaped interview prior to which appellant was again reminded of his Miranda rights and his waiver thereof. Pizzulo specifically verified that appellant: understood his Miranda rights; had signed the written rights form; had read the standardized rights form; and, had waived his rights. Thus, Pizzulo's misstatement was corrected when appellant read the standardized rights form and, again, when appellant was reminded of his Miranda rights correctly stated therein. Based on the foregoing, we conclude that Pizzulo's single misstatement in restating appellant's Miranda rights does not require suppression of his subsequent statements.
Additionally, appellant contends that his statements to the police should be suppressed because he asked: "twice if he could go home and once whether he could have an attorney present at questioning." Review of the record reveals that the following discussion took place during the audiotaped interview with Pizzulo:
[Appellant]: I might be able to go home. [sic]
 [Pizzulo]: Oh, yeah, we're gonna work all that stuff out, I want you to look at her,
[Appellant]: I want to get my head straight.
 [Pizzulo]: All right. I want you to get your head straight too.
 [Appellant]: If I did, I'm gonna try to remember because this, I'd never think of doing that.
* * *
[Pizzulo]: I have to use the bathroom.
[Appellant]: Can I go home?
 [Pizzulo]: Let me use the bathroom. I want you to still think about it. I, just think for a minute, just try to recall what happened okay. [sic].
* * *
 [Pizzulo]: Now listen, this should only take about another 45 minutes. Um, I'd like to bring a videotape in, and just go over what we talked about, will that be all right with you?
[Appellant]: Well, can I have a lawyer present?
 [Pizzulo]: If that's what you want, you know. It's just that I'm not gonna go into anything we haven't already talked about.
[Appellant]: Ok.
 The United States Supreme Court has held that: "[i]f the suspect effectively waives his right to counsel after receiving the Miranda warnings, law enforcement officers are free to question him. But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." Davis v. U.S. (1994), 512 U.S. 452, 458, citing Edwards v. Arizona, 451 U.S. 477, 484-485. The court, in Davis, went on to state that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Id. at 459. Further, "[i]f the suspect's statement is not an ambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Id.
In this case, appellant did not make a request for counsel; he merely asked if he could have a lawyer present. Similarly, appellant did not indicate a clear desire to stop the interview and go home. Rather, appellant inquired whether he might be able to go home. In fact, in response to appellant's inquiries, Pizzulo told appellant that he could have counsel present during the interview and that he might be able to go home. Pizzulo did not tell appellant that he could not go home. To the contrary, appellant was free to go, but chose to waive his Miranda rights and cooperate with the investigation. Thus, we conclude that appellant did not make a clear request to leave and did not invoke his right to counsel.
Next, we will address appellant's motion to suppress the in-court identification made by Corado. "The rationale for excluding a tainted pretrial identification is to protect a defendant from misconduct by the state." State v. Brown (1988), 38 Ohio St.3d 305, 310. Absent state involvement contributing to the witness's pretrial exposure to the defendant, due process guarantees are not implicated. Id at 310-311. Therefore, where there is no state action involvement, "[t]he alleged suggestiveness of the identification, * * * goes to the weight and reliability of the testimony rather than admissibility." Id. In the instant case, there was no state action. Thus, Corado's in-court identification was admissible.
Appellant's first assignment of error lacks merit.
In appellant's second assignment of error, he contends that his conviction is against the manifest weight of the evidence. In support of his argument, appellant asserts that his statements are unreliable, the state's witnesses were not credible, and the DNA evidence and statistics were confusing to the jury.
This court has stated that:
 "* * * `manifest weight' requires a review of the weight of the evidence presented, not whether the state has offered sufficient evidence on each element of the offense. "`In determining whether the verdict was against the manifest weight of the evidence," (* * *) the court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (* * *)' * * *." (Citations omitted and Emphasis sic.) State v. Schlee (Dec. 23, 1994), Lake App. No 93-L-082, unreported, 1994 Ohio App. LEXIS 5862 at 14-15.
 In this case, appellee presented competent, credible evidence, including appellant's statements, witness testimony, and DNA evidence, from which the jury could properly have found that appellant had committed the crimes charged. Several witnesses testified that they saw a man who looked like appellant, with Bridget, on the evening of her murder, in the location where her body was found. Ms. Duvall, a BCI forensic scientist, analyzed DNA samples taken from appellant, the victim and her clothing, and testified that DNA from the victim's rectal swabs were consistent with appellant's DNA. Appellant was designated as "a major contributor." Ms. Duvall further testified that the chance of somebody having the same DNA profile as the one found in the victim's rectal swab, was one in 6.7 trillion people, for the Caucasian population. While Duvall testified that the DNA profile of the sperm was consistent with a mixture of more than two people, appellant could not be excluded as a contributor of that semen. The fact that a third person could have been a contributor does not negate the fact that appellant's DNA was consistent with the sperm from the victim's rectal swab and her clothing.
Therefore, we conclude that, in weighing the evidence and considering the credibility of the witnesses, the jury did not lose its way and create a manifest miscarriage of justice when it found appellant guilty of: aggravated murder, in violation of R.C. 2903.01(C); aggravated murder with specification of aggravated circumstances, in violation of R.C.2903.01(B); kidnapping, in violation of R.C. 2905.01(A)(4); and, three counts of rape, in violation of R.C. 2929.04(A)(7). Our review of the record reveals that reasonable minds could conclude that all of the elements of these crimes had been proven beyond a reasonable doubt. Accordingly, appellant's second assignment of error is without merit.
In appellant's third assignment of error, he argues that he was denied his constitutional right to a fair trial because of prosecutorial misconduct. Appellant contends that during the state's opening statement and closing argument, the prosecutor made a number of improper statements. Regarding the state's opening statement, appellant specifically objects to the prosecutor's statements that appellant: was "misdirecting" the police during the early morning search; didn't tell the truth; and, "that he lies with half-truths to minimize and escape responsibility." Appellant also takes issue with the prosecutor's comments regarding how fecal matter got on the victim's shirt. With regard to the state's closing argument, appellant objects to the prosecutor's comments that the victim had a right to live and that the jury was setting the standard of justice.
"The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Smith (2000), 87 Ohio St.3d 424, 442. The focus "is the fairness of the trial, not the culpability of the prosecutor." Id.,
citing Smith v. Philips (1982), 455 U.S. 209, 219. Thus, prosecutorial misconduct is not grounds for reversal unless it so taints the proceedings that a defendant is deprived of a fair trial. Smith at 442.
After reviewing the prosecutorial comments of which appellant complains, we cannot conclude that any of them, individually or in their totality, prejudicially affected appellant's substantial rights. The prosecutor's comments that appellant had misdirected the police and told "lies with half-truths" were supported by the evidence, which demonstrated that prior to making numerous incriminating statements, appellant, in fact, led the police to the wrong area of the woods and denied any involvement in Bridget's disappearance. The prosecutor's comment, during opening statement that the fecal matter on the victim's shirt had resulted from appellant wiping his penis on her shirt, while improper, does not warrant a reversal. The trial court sustained the appellant's objection and had previously instructed the jury regarding sustained objections. A jury is presumed to follow the instructions of the trial court. See, e.g., State v. Loza (1994), 71 Ohio St.3d 61, 79.
During closing argument, appellant did not object when the prosecutor commented on the source of the fecal matter. The Supreme Court of Ohio has declined to find that a prosecutor's comments regarding a victim's right to life, constitutes prosecutorial misconduct. See, e.g., State v.Davies (1997), 80 Ohio St.3d 311, 325. Thus, we conclude that the strength of the evidence against appellant weighs against a conclusion that appellant was prejudiced by any of the prosecutor's arguments. Therefore, appellant's third assignment of error has no merit.
Based on the foregoing the judgment of the Trumbull County Court of Common Pleas is affirmed.
FORD, P.J., VUKOVICH, J., Seventh Appellate District, Sitting by assignment, concur.
[1] As a matter of clarification, we note that the Weathersfield Township Police, McDonald Village Police and the Trumbull County Sheriff's Department were involved in the investigation of this case.